500 FIFTH AVENUE, INC., Respondent, *v.* MORRIS D. DALSHEIM, Appellant.

Argued December 1, 1949; decided December 29, 1949.

588

*Alexander Bicks* and *Bernard A. Helfat* for appellant.
*Orrin G. Judd, Sidney B. Moskovitz* and *Saul A. Shames* for respondent.

Judgment affirmed, with costs. [See 300 N. Y. 680.]

Concur: Loughran, Ch. J., Lewis, Conway, Desmond, Dye, and Bromley, JJ. Fuld, J., dissents in opinion.

Fuld, J. (dissenting). The court is here holding that, in dealing with percentage rent leases, the rental that may be charged is not that payable on the statutory freeze date — the situation in all other cases — but rather the rental provided for in a lease in force when the statute became effective, which was about a year after the freeze date. The consequence of such a decision is to lay down a different rule for percentage rent leases and to sanction whatever rent a landlord chose to exact, without regard to the amount called for by the lease in force on the freeze date. In my judgment, such a construction, not required by the language of the statute, does violence to the design and spirit of the emergency rent laws.

In August of 1943, defendant, a tenant of plaintiff's store premises in New York City for four years, entered into a written agreement renewing for one year a lease executed in 1939. The rental reserved under the renewal agreement was a fixed minimum annual rent of $6,500 plus 10% of the tenant's gross receipts in excess of $65,000. On August 11, 1944, as the term was drawing to a close, the parties entered into a further agreement again extending the lease for a one-year period; this agreement raised the fixed minimum rent to $8,000 a year and increased the percentage rent to 15% of the tenant's gross receipts in excess of $40,000.

On March 28, 1945, the legislature enacted the Business Rent Law (L. 1945, ch. 314). It provided that the " emergency rent " was the rent " payable under any lease  *  *  *  in force on June first, nineteen hundred forty-four, plus fifteen per centum of such rent " (§ 2, subd. [c]). Section 13, which deals with a lease providing for a " variable " rent, reads in part as follows: " Any lease existing or future wherein the specified rent or any part thereof is variable according to volume or other criteria of volume of the tenant's business shall continue without change, but where such lease provides for the payment of a fixed, basic or minimum rent, such fixed amount shall be subject to the provisions of this act." The words " existing or future " were added by the legislature in 1948 (L. 1948, ch. 677).

The question presented is, which of the two rental agreements, the agreement of August, 1943, in force on the freeze date, June

1, 1944, or the agreement entered into a year later and in force on the statute's effective date, March 28, 1945, is the one which section 13 provides " shall continue without change ". Reading section 13, as it must be read, against the background of the act as a whole, its objectives and the economic situation which moved the legislature to enact it, I can discern no intent or design to exempt variable rent leases from the roll-back concept that underlies the statute.

The landlord's construction — resulting as it does in placing tenants who pay a variable rent in a class apart from other tenants — comports neither with the reason for the statute nor with the dictates of logic or fairness. A tenant under a variable rent lease, which expired during the period between the freeze date and the effective date, was in no better bargaining position, was under no less restraint or coercion, by reason of existing shortages than a tenant under a lease, expiring at the same time, which prescribed a fixed rental.

The entire purpose of the legislature, in establishing a freeze date prior to the effective date of the statute, was to relieve tenants of the disadvantages to which they had been subjected in the period intervening. (See Report of Joint Legislative Committee to Inquire into and Study Commercial Rents in New York City, p. 20; N. Y. Legis. Doc., 1945, No. 2.) And, indeed, this court expressly so recognized when it wrote (*Twentieth Century Associates* v. *Waldman,* 294 N. Y. 571, 581): " the evils denounced in the statute flowed, not merely from leases which might thereafter be executed, but even more directly from leases already made ". Consequently, if a tenant paying a variable rent was subject to the same conditions and exigencies as all other tenants — and of that there can be little doubt — there could be neither reason nor basis for the legislature's discriminating against the former — that is, one paying a variable rent.

When section 13 recites that the variable portion of a percentage lease shall " continue without change ", it can only mean, reasonably, that the percentage lease in effect on the freeze date shall continue without change. The intendment or design of that provision undoubtedly was to avoid the unfairness which would result if, instead of continuing the percentage lease, the precise amount of rent paid on the freeze date was taken as the determinant of the emergency rent. In other words, frozen was the yardstick or rate of percentage

which the parties fixed at a time when normal processes of bargaining existed, not the quantum which the application of such percentage rate to the tenant's volume of business on any particular date would produce.

Entirely lacking is any evidence or indication that percentage leases were to be exempt from the freeze or from the date of freeze. This emerges clearly and convincingly from the scheme of the emergency legislation that " all rental space " be subject to rent control. (Business Rent Law, § 2; see, also, *Twentieth Century Associates* v. *Waldman, supra,* 294 N. Y. 571.) If any possible ambiguity exists — as to whether the percentage provision " shall continue without change " from the effective date of the legislative enactment or from the freeze date — the statute should be interpreted to effectuate its " basic purpose ", namely, " to protect tenants by placing a ceiling on rents and by preventing widespread evictions while the emergency created by the wartime shortage of space continued." (*Morse & Grossman, Inc.,* v. *Acker & Co.,* 297 N. Y. 304, 310.) It need hardly be said that it is the roll-back of percentage rates to the freeze date that " effectuates " the purposes of the statute to protect tenants from " unjust, unreasonable and oppressive leases and agreements for the payment of rent " (Business Rent Law, § 1).

A tenant's rental obligation under a lease is single, and it remains such though expressed in terms of a fixed minimum to be credited or added to an agreed percentage of the tenant's volume of business. That being so, the statute's mandate, announced in unequivocal language, that the basic or minimum rent under a percentage lease is to be rolled back to the freeze date, June 1, 1944 (Business Rent Law, § 13), likewise renders that date controlling in ascertaining the percentage rate. To hold that the percentage component of a rental need not be rolled back but that the fixed minimum must, would in effect be to determine that, in fixing the basic rent, a " ' breakdown has taken place in the normal processes of bargaining ' " and " ' freedom of contract has become an illusory concept ' " (see *Twentieth Century Associates* v. *Waldman, supra,* 294 N. Y. 571, 578, 579), but that, in fixing the percentage rent between the same parties at the same time, in the same lease, vis-a-vis the same premises, exactly the opposite conditions prevailed. Neither the language nor the scheme of the statute dictates any such unreasonable and unrealistic result.

The recent 1948 addition of the words " existing or future " in section 13 does not accomplish the construction contended for by plaintiff landlord. The direction that a future lease " shall continue without change ", standing alone, is meaningless, since the future lease of necessity must *commence* before it can *continue*. All it can denote is that a variable lease validly made within the framework of the statute — that is, one whereunder the rent is fixed by arbitration or by the Supreme Court or by a so-called " sixty-day agreement " — shall be enforcible. In point of fact, the amendment served only to clarify the relationship between sections 4 and 13 of the statute. When section 13 was amended to provide for graduated leases, it prescribed a method — superseding the application of the more generally worded section 4 — for fixing a reasonable rent for landlords and tenants under such leases. The phrase " existing or future " was added to section 13 at the same time that section 4 was amended, in order to assure that a reasonable rental, validly fixed under section 4, became the " emergency " rental under section 13; those words were designed simply to make certain that percentage leases, new and old, should be subject to the " emergency " and " reasonable " rent provisions of section 4 and not to the comparability provisions of section 13 which are applicable to graduated leases only. (Cf., e.g., *Matter of 500 Fifth Ave.* [*Wise Shoe Co.*], 274 App. Div. 241, affd. 300 N. Y. 491; *Matter of Dworman* [*Milgrim-Christie*], 270 App. Div. 568; *Cortlandt & Dey Streets Corp.* v. *New York Lerner Co.*, 84 N. Y. S. 2d 9.) Certainly, the words added by the amendment cannot be construed to exempt percentage leases from effective rent control.

Under the statute as I believe it should be construed, then, the landlord is entitled — in addition to the 15% emergency increase over the basic fixed rent which it has been receiving — only to 10% of the tenant's gross receipts in excess of $65,000 a year, since that was the percentage prescribed in the rental agreement of August, 1943, the agreement in effect on June 1, 1944, the freeze date under the statute (Business Rent Law, § 2, subd. [e]; § 13). Ten percent of the tenant's gross receipts over $65,000 for each of the years here involved amounts to $2,201.60.

The judgment of the Appellate Division should be modified, therefore, by reducing it to the sum of $2,201.60, and, as so modified, affirmed, with costs to defendant in all courts.